[No. B150674. Second Dist., Div. Three. Aug. 1, 2002.]

ATLANTIC MUTUAL INSURANCE COMPANY, Plaintiff and Respondent, v.
J. LAMB, INC., Defendant and Appellant.

[No. B151708. Second Dist., Div. Three. Aug. 1, 2002.]

ATLANTIC MUTUAL INSURANCE COMPANY, Plaintiff and Respondent, v.
GRANITE STATE INSURANCE COMPANY, Defendant and Appellant.

## COUNSEL

The Soni Law Firm, Surjit P. Soni, Leo E. Lundberg, Jr., and Glenn H. Johnson for Defendant and Appellant J. Lamb, Inc.

McCormick, Barstow, Sheppard, Wayte & Carruth, James P. Wagoner and Todd W. Baxter for Defendant and Appellant Granite State Insurance Company.

Knapp, Petersen & Clarke and Gwen Freeman for Plaintiff and Respondent Atlantic Mutual Insurance Company.

## OPINION

**CROSKEY, J.**—The primary issue presented by these consolidated appeals[1] concerns the existence of coverage under a liability policy for a claim based upon disparaging statements allegedly made by the insured about a third party's business and products.

The plaintiff and respondent, Atlantic Mutual Insurance Company (Atlantic Mutual), filed this action for declaratory relief seeking a determination that there was no coverage under its policy. The trial court agreed with Atlantic Mutual's position and the defendants and appellants, J. Lamb, Inc. (Lamb), and Granite State Insurance Company (Granite State), appeal from

---

[1]On our own motion, we have consolidated case Nos. B150674 and B151708 for resolution in a single opinion.

the summary judgment entered against them. Lamb was the insured in successive years under policies issued by Atlantic Mutual and Granite State and claims that it is entitled to recover under the Atlantic Mutual policy even though it has already settled the same claim with Granite State. Granite State, on the other hand, claims that Atlantic Mutual is liable to it for equitable contribution and/or subrogation and such claim is not precluded by its prior settlement with Lamb.

Because we conclude that the disparaging statements published by Lamb fall within the very broad "personal injury" coverage provided in Atlantic Mutual's policy, we reverse the summary judgment entered in Atlantic Mutual's favor. In so doing, we distinguish this case from our earlier decision in *Truck Ins. Exchange v. Bennett* (1997) 53 Cal.App.4th 75 [61 Cal.Rptr.2d 497] (*Bennett*), based on the more expansive policy language before us that compels us to conclude that personal injury coverage was intended for disparaging publications in addition to those that were solely defamatory. We also conclude that there was a *potential* for coverage under the policies of both Atlantic Mutual and Granite State, and thus both insurers owed Lamb a defense of the third party suit filed against it, even though only one will have a duty to indemnify. Determining under which policy *actual* coverage will fall is a task for the trial court upon remand. Such determination, when made, will provide a basis for the trial court to resolve the remaining issues between the parties.

## FACTUAL AND PROCEDURAL BACKGROUND[2]

This coverage litigation arises out of a complaint filed against Lamb in the underlying federal action by Continental Quilting Co., Inc. (Continental), on May 3, 1999. In that complaint, Continental sought a declaration that a patent claimed by Lamb, a competitor of Continental, was invalid and unenforceable. The complaint also contained causes of action for statutory and common law unfair competition and tortious interference with prospective advantage. In essence, and as is relevant to the issues raised in this matter, Continental alleged that Lamb had communicated with a number of Continental's customers and falsely stated that Continental was infringing a patent owned by Lamb and that Lamb would pursue legal action against those customers who continued to purchase the infringing products sold by Continental.[3]

On June 15, 1999, Lamb tendered defense of Continental's action to both Atlantic Mutual and Granite State. Both denied coverage and refused to

---

[2]The facts recited are not in dispute and are established by the appellate record before us. The issues we resolve are legal in nature.

[3]Specifically, Continental pled the following allegations in its complaint that are relevant to the coverage issue before us:

provide a defense. Atlantic Mutual's policy covered the period December 2, 1998, to December 2, 1999. Granite State's policy covered the preceding two years, December 2, 1996, to December 2, 1998. The policies of both insurers were substantially identical with respect to the relevant policy provisions.[4] Lamb contends there is coverage under both the "personal injury" clause as well as the "advertising injury" provision.[5]

---

"61. Lamb has contacted and continues to contact Continental Quilting's customers and potential customers and has asserted the '642 patent against them in spite of knowing that the '642 patent is invalid and unenforceable.

"62. On information and belief, Lamb's communications with Continental Quilting's customers and potential customers have included improper threats, and are made with the intent to mislead those customers and potential customers with respect to Continental Quilting's products.

"63. Lamb communicated with Continental Quilting's customers to induce those customers and potential customers to discontinue or refrain from purchasing Continental Quilting's products and to instead purchase Lamb's products.

"64. On information and belief, Lamb asserted the '642 patent against Continental Quilting's customers and potential customers in bad faith and without any intention of enforcing the '642 patent against those customers or potential customers. On information and belief, Lamb intentionally misled Continental Quilting's customers about the nature of Continental Quilting's products. [¶] . . . [¶]

"71. On information and belief, Lamb contacted and continues to contact Continental Quilting's customers and potential customers and threatened them with the '642 patent, which Lamb knew or should have known was invalid. On information and belief, Lamb threatened to bring a patent infringement action against Continental Quilting's customers and potential customers and made other threats and harassing statements in bad faith and without any intention of bringing such action. Lamb contacted those customers and potential customers with the intention of interfering with Continental Quilting's business expectancies with those customers and potential customers so as to deprive Continental Quilting of realizing any financial benefit from those expectancies."

[4]The relevant insuring and definitional clauses of the policies of both insurers are based on standard ISO forms and provide as follows:

"1. Insuring Agreement [¶] We will pay those sums that the insured becomes legally obligated to pay as damages because of 'personal injury' or 'advertising injury' to which this insurance applies. We will have the right and duty to defend any 'suit' seeking those damages. . . . [¶] . . . This insurance applies to: (1) 'Personal injury' caused by an offense arising out of your business, excluding advertising, publishing, broadcasting or telecasting done by or for you; (2) 'Advertising injury' caused by an offense committed in the course of advertising your goods, products or services; *but only if the offense was committed in the 'coverage territory' during the policy period.* [¶] 2. Definition [¶] 'Advertising injury' means injury arising out of one or more of the following offenses: Oral or written publication of material that slanders or libels a person or organization or disparages a person's or organization's goods, products or services; . . . [¶] . . . 'Personal injury' means injury other than 'bodily injury,' arising out of one or more of the following offenses: . . . [¶] . . . *oral or written publication of material that slanders or libels a person or organization or disparages a person's or organization's goods, products or services*; . . ." (Italics added.)

[5]For the reasons set out in footnote 12, *post*, we need only consider and discuss the coverage of the insurers under the "personal injury" provision.

Both insurers based their denial of coverage on the ground that the allegations of the Continental complaint established that there was no potential for coverage as no claim for either "personal injury" or "advertising injury" was asserted. In addition, Atlantic Mutual contended that whatever acts may have been committed by Lamb, they did not occur *during the policy period* as required by the insuring clause. Atlantic Mutual also argued that its "first publication" exclusion applied to preclude coverage.[6]

Denied coverage under its liability policies, Lamb entered into negotiations with Continental to settle the underlying action. On August 23, 1999, a settlement was reached whereby Lamb paid $65,000 to Continental in exchange for a dismissal of the underlying action.[7] In addition, Lamb incurred $89,455 in defense costs and attorney's fees in reaching this resolution of the matter.

Thereafter, Lamb wrote to both Atlantic Mutual and Granite State, advised them of the settlement of the Continental action and requested that they reconsider their denial of coverage. Atlantic Mutual refused to change its position, but Granite State *was* persuaded to do so and entered into negotiations with Lamb. On or about March 14, 2000, a settlement was reached whereby Granite State agreed to pay Lamb $120,000 in exchange for a full release of all liability arising from the Continental claim.[8]

---

[6]Atlantic Mutual's policy provided that: "This insurance *does not apply to*: 'Personal Injury' or 'Advertising Injury': Arising out of oral or written publication of material whose *first* publication took place *before* the beginning of the policy period; . . ." (Italics added.)

[7]Lamb did not actually pay $65,000 in cash to Continental, but rather agreed to provide to Continental 20,000 units of crib mattress pads at $2.50 per unit. Lamb claims that its customary charge per unit for such pad was $5.75. The $3.25 difference multiplied by 20,000 resulted in what Lamb claimed was settlement consideration of $65,000. It appears, however, that a factual dispute exists as to whether this settlement consideration provided to Continental had an actual value of $65,000.

[8]The relevant portions of the settlement and release agreement between Lamb and Granite State provide: "This Settlement Agreement and Mutual Release ('Release') is entered into by and between J. LAMB, INC. (hereinafter 'RELEASOR') and GRANITE STATE INSURANCE COMPANY (hereinafter 'RELEASEE'), collectively referred to herein as 'THE PARTIES,' pursuant to the following: [¶] RECITALS [¶] A. RELEASEE issued to RELEASOR general liability policies number CPP 512-43-96 and CPP 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 ('the policies'). [¶] B. On or about May 3, 1999, an action was filed entitled Continental Quilting Company, Inc. v. J. LAMB, Inc., United States District Court Case No. 99-04767 ('the Continental Quilting Action.') [¶] C. RELEASOR tendered the CONTINENTAL QUILTING Action to RELEASEE for defense and indemnification. RELEASEE initially declined to provide a defense to RELEASOR in the Continental Action. [¶] D. Subsequently, RELEASOR settled the Continental Quilting Action incurring attorneys' fees and costs in the amount of $89,455.18. Resolution of the Continental Quilting Action also involved RELEASOR sending product to Continental Quilting at a reduced price suffering loss of $65,000.00. [¶] E. RELEASOR requested that RELEASEE reconsider its denial, which RELEASEE agreed. [¶] THE PARTIES now desire to settle all claims, disputes,

Shortly after March 14, 2000, Granite State advised Atlantic Mutual that it had also insured Lamb and that it had paid all of the defense costs (i.e., $89,455) incurred by Lamb in defending the Continental action, as well as a part of the settlement costs allegedly expended by Lamb. This was apparently the first time that Atlantic Mutual learned that another insurer was involved in the matter. Granite State demanded that Atlantic Mutual share, on an equitable basis, the $120,000 it had paid to Lamb to cover the above described expenses.

About the same time, Lamb also made a separate demand on Atlantic Mutual. Lamb took the position that Granite State's payment to it was *not* for defense or settlement of the Continental action, but rather was a "claim buyout" in which Lamb agreed to release its bad faith claim against Granite State and to accept a novation of the Granite State policy "to exclude past, present or future coverage relating to" the Continental action. Lamb demanded that Atlantic Mutual pay Lamb the full amount of its total defense and settlement expense ($154,455) which it claims to have incurred in the Continental action.

Atlantic Mutual rejected this demand and advised Lamb's counsel that Lamb had no right to be paid twice for the claim. Facing claims from both Lamb and Granite State for substantially the same money, and believing it owed nothing to either party, Atlantic Mutual, on May 30, 2000, filed this action against them for declaratory relief to determine the issue of coverage under its policy and its liability, if any, to either party.[9]

duties, and all other obligations between them arising out of or in any way connected with any claims arising from the Continental Quilting Action. [¶] Now THEREFORE, in consideration of the respective covenant by and between THE PARTIES, as set forth below, THE PARTIES do hereby agree as follows: [¶] 1. AFFIRMATIVE COVENANT: [¶] A. RELEASEE will deliver to RELEASOR's attorney a draft in the amount of $120,000.00 made payable to 'The Soni Law Firm Trust Account for the Benefit of J. Lamb, Inc.' [¶] 2. Release [¶] A. For and in consideration of the above affirmative covenant, RELEASOR hereby releases and forever discharges RELEASEE of and from any liability, duty or obligation under the Policies (including, without limitation, any duty to investigate, defend or indemnify) related to any and all past, pending or future claims made as a result of the Continental Quilting Action. Neither party releases, waives, or otherwise modifies its rights or obligations under the policy with respect to any other claim, whether such claim has manifested or not, except all claims arising from, or obligations under, the policy with respect to any other claim, whether such claim has manifested or not, except all claims arising from the Continental Quilting Action [¶] . . . [¶] D. Whole Agreement [¶] This Release contains the entire agreement between THE PARTIES relating to the transactions contemplated hereby and all prior or contemporaneous agreements, understandings, representations and statements, oral or written, are merged into this Release."

[9]In its complaint, Atlantic Mutual described its position in this dispute as follows: "Atlantic Mutual contends that if it had a duty to defend and/or indemnify then Granite State is equitably subrogated to the right of the insured as to any claim against Atlantic Mutual, and/or Granite State is the sole possessor of a right of contribution against Atlantic Mutual.

On July 20, 2000, Lamb filed a cross-complaint that included claims against Atlantic Mutual for breach of contract and bad faith and for declaratory relief against Granite State as to the meaning, purpose and legal effect of the settlement and release agreement of March 14, 2000 (hereafter the Settlement Agreement). Granite State also filed a cross-complaint against Atlantic Mutual for equitable subrogation and/or alternatively, equitable contribution.

Atlantic Mutual moved for summary judgment against both Lamb and Granite State on the ground that there was no coverage under its policy for the claim asserted in the Continental action and therefore it had no liability to either party as a matter of law. Granite State also moved for summary judgment on its cross-complaint against Lamb. Lamb filed cross-motions for summary judgment against both Atlantic Mutual and Granite State. With respect to these competing motions, the trial court, in April and May, 2001, ruled as follows:

1. Atlantic Mutual's motion against Lamb on its complaint and Lamb's cross-complaint was granted on the ground that the Continental complaint had not alleged an offense that constituted either advertising or personal injury within the meaning of the Atlantic Mutual policy (this ruling is the subject of the appeal in case No. B150674).[10]

2. Atlantic Mutual's motion against Granite State was granted on the ground that since there was no coverage for the underlying Continental claim under the Atlantic Mutual policy, Atlantic Mutual had no duty to Granite State under either equitable subrogation or equitable contribution for any sums paid with respect to the Continental claim against Lamb (this ruling is the subject of the appeal in case No. B151708).

3. Granite State's motion against Lamb on Lamb's cross-complaint for declaratory relief was granted on the grounds that: (1) the Settlement Agreement between Granite State and Lamb was not a novation; (2) the

Atlantic Mutual desires to settle the disputed claim with Granite State but is prevented from doing so by such competing, inconsistent claim from Lamb. Both Lamb and Granite State have made competing and inconsistent claims for the same sums by way of subrogation, contribution, and/or indemnity from Atlantic Mutual. The combined sum sought is in excess of the total amount expended by Lamb in defending and settling the underlying action. Atlantic Mutual is informed and believes that all defendants contend otherwise in whole or in part. Atlantic Mutual also denies any potential liability for breach of the covenant of good faith and fair dealing."

[10]The trial court, in making this ruling, expressly did not reach or rule upon Atlantic Mutual's contention that coverage was precluded under the "first publication" exclusion.

$120,000 paid to Lamb was to satisfy Lamb's "claim that it was entitled to reimbursement for its defense fees and settlement consideration in the Continental action"; and, (3) the Settlement Agreement does not impair any rights Granite State may have to equitable subrogation against, or equitable contribution from, Atlantic Mutual (this ruling, which we deem to be a summary adjudication of the claims raised by Lamb's cross-complaint, is also the subject of the appeal in case No. B150674).[11]

Both Lamb (case No. B150674) and Granite State (case No. B151708) have filed timely appeals and we have, on our own motion, consolidated them for resolution in this single opinion.

### CONTENTIONS OF THE PARTIES

Lamb contends that the allegations of the Continental complaint in the underlying action sufficiently allege an offense within the meaning of the "personal injury" clause in Atlantic Mutual's policy. Therefore, Lamb argues, there was at least a potential for coverage and Atlantic had a duty to provide both a defense and indemnity to Lamb for Continental's claim.

Lamb also contends that the Settlement Agreement between it and Granite State did not involve the reimbursement to Lamb of its costs and expenses incurred in defending and settling the Continental action, but rather the settlement by Granite State of Lamb's separate bad faith claim. As a result, Lamb argues, Granite State has no right to claim either equitable subrogation or equitable contribution against Atlantic Mutual. Therefore, Lamb argues, since there was coverage under the Atlantic Mutual policy, Lamb is the party entitled to recoup *all* of the costs and expense of defending and settling the Continental action. Granite State, having paid no part of that sum, is not entitled to any recovery from Atlantic Mutual.

Granite State concurs with and joins Lamb's first argument relating to the question of whether there is coverage under Atlantic Mutual's policy. (This issue is thus necessarily common to the appeals in both case No. B150674 and case No. B151708.) However, Granite State disputes Lamb's characterization of the Settlement Agreement. It is Granite State's position that there was no agreement to settle anything other than Lamb's coverage claim under the Granite State policy. Granite State contends that, by the express terms of

---

[11]The court also awarded Granite State attorney fees pursuant to a fee provision in the Settlement Agreement. Lamb has separately appealed that award in case No. B154194. That matter is not before us.

the Settlement Agreement, it reimbursed Lamb for *all* of its defense costs and expenses and a negotiated portion of its claimed settlement expense. Granite State claims that the amount actually "paid" by Lamb to settle the Continental claim was subject to considerable dispute and thus the total figure of $120,000 paid to Lamb by Granite State represented the fruit of a negotiated compromise.

For its part, Atlantic Mutual disputes the coverage arguments jointly advanced by Lamb and Granite State. It argues that the claims asserted by Continental and the allegations of its complaint in the underlying action did not, *as a matter of law*, constitute an offense within the meaning of the personal injury clause of the Atlantic Mutual policy.[12] It also argues that it is undisputed that Lamb first published the disparaging statements prior to the inception of the Atlantic Mutual policy. Therefore, the "first publication" exclusion applies to preclude coverage in any event. As a result, Atlantic Mutual claims it has no liability, as a matter of law, to either Lamb or Granite State.

## DISCUSSION

### 1. *Standard of Review*

These consolidated appeals come to us after the trial court granted Atlantic Mutual's motion for summary judgment. ■ The purpose of such a motion is to expedite litigation and eliminate needless trials. (*Hood v. Superior Court* (1995) 33 Cal.App.4th 319, 323 [39 Cal.Rptr.2d 296].) It

---

[12]The only "offense" relevant to this case appears, in identical terms, in both the *personal injury* and *advertising injury* clauses of the Atlantic Mutual policy: "Oral or written publication of material that slanders or libels a person or organization or *disparages a person's or organization's goods, products or services.*" (Italics added.)

The only difference between the two promised coverages is that, for coverage to exist under the advertising injury clause, the oral or written publication must have occurred "in the *course of advertising* [Lamb's] goods, products or services." (Italics added.) Under the personal injury clause, the offense must arise "out of [Lamb's] business *excluding advertising*, publishing, broadcasting or telecasting done by or for [Lamb]." (Italics added.) It is not at all clear that the alleged oral or written publications about which Continental complained occurred in any "advertising" activity by or for Lamb, but we need not reach that issue. The critical question before us relates to whether such oral or written publications slandered or libeled Continental or disparaged it or its goods, products or services. If they did, there will be coverage under Atlantic Mutual's policy without regard to whether any advertising activity was involved (assuming that the "first publication" exclusion does not apply); if they did not, there will be no coverage, whether or not the oral or written publications were uttered or communicated in the course of an advertising activity. As a result, there is no need for us to consider or discuss the question of coverage under the advertising injury clause.

may be granted only "if all the papers submitted show that there is no triable issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." (Code Civ. Proc., § 437c, subd. (c); *Villa v. McFerren* (1995) 35 Cal.App.4th 733, 741 [41 Cal.Rptr.2d 719].) After examining documents supporting a summary judgment motion in the trial court, this court independently determines their effect as a matter of law. (*Villa v. McFerren, supra,* 35 Cal.App.4th at p. 741.)

■ "[F]rom commencement to conclusion, the party moving for summary judgment bears the burden of persuasion that there is no triable issue of material fact and that he is entitled to judgment as a matter of law. . . . There is a triable issue of material fact if, and only if, the evidence would allow a reasonable trier of fact to find the underlying fact in favor of the party opposing the motion *in accordance with the applicable standard of proof.*" (*Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 850 [107 Cal.Rptr.2d 841, 24 P.3d 493] (*Aguilar*), fns. omitted, italics added.) An issue of fact becomes one of law and loses its "triable" character only if the undisputed facts leave no room for a reasonable difference of opinion. (*Preach v. Monter Rainbow* (1993) 12 Cal.App.4th 1441, 1450 [16 Cal.Rptr.2d 320].)

■ A defendant moving for summary judgment bears a burden of production to make a prima facie showing, by declarations and/or other evidence, that there is a complete defense to the plaintiff's action or an absence of an essential element of plaintiff's case. (*Aguilar, supra,* 25 Cal.4th at p. 849.) "Once the defendant . . . has met that burden, the burden shifts to the plaintiff . . . to show that a triable issue of one or more material facts exists as to that cause of action or a defense thereto. The plaintiff . . . may not rely upon the mere allegations or denials of its pleadings to show that a triable issue of material fact exists but, instead, shall set forth the specific facts showing that a triable issue of material fact exists as to that cause of action or a defense thereto." (Code Civ. Proc., § 437c, subd. (o)(2).)

■ Where the facts are undisputed, the court can resolve the question of law in accordance with general summary judgment principles. (*Adams v. Paul* (1995) 11 Cal.4th 583, 592 [46 Cal.Rptr.2d 594, 904 P.2d 1205].) "Absent a *factual* dispute as to the meaning of policy language, which we do not have here, the interpretation, construction and application of an insurance contract is strictly an issue of law. [Citation.]" (*Century Transit Systems, Inc. v. American Empire Surplus Lines Ins. Co.* (1996) 42 Cal.App.4th 121, 125 [49 Cal.Rptr.2d 567], italics in original.)

■ A liability insurer's duty to defend will arise when a suit against an insured *potentially* seeks damages within the coverage of the policy. (*La Jolla Beach & Tennis Club, Inc. v. Industrial Indemnity Co.* (1994) 9 Cal.4th 27, 43 [36 Cal.Rptr.2d 100, 884 P.2d 1048].) An insurer, however, need not defend if the third party complaint cannot, *by any conceivable theory*, raise a single issue which would bring it within policy coverage. (*Ibid.*) Thus, the settled rule is that where a pleading against the insured raises the *potential* for coverage, the insurer must provide a defense. (*Montrose Chem. Corp. v. Superior Court* (1993) 6 Cal.4th 287, 295 [24 Cal.Rptr.2d 467, 861 P.2d 1153] (*Montrose*).) In order to prevail on a motion for the summary adjudication of the duty to defend, "the insured need only show that the underlying claim *may* fall within coverage; the insurer must prove it *cannot*." (*Id.* at p. 300.)

### 2. *Principles of Personal Injury Coverage*

Like advertising injury, "personal injury" is a term of art that describes coverage for certain enumerated offenses that are spelled out in the policy. In this case, the only relevant "offense" under the relevant policy language is an "oral or written publication of material that slanders or libels a person or organization *or disparages a person's or organization's goods, products or services.*" (Italics added.) ■ Coverage for personal injury is not determined by the nature of the damages sought in the action against the insured, but by *the nature of the claims* made against the insured in that action. Under the personal injury policy provision, "[c]overage . . . is triggered by the *offense*, not the injury or damage which a plaintiff suffers." (*Fibreboard Corp. v. Hartford Accident & Indemnity Co.* (1993) 16 Cal.App.4th 492, 511 [20 Cal.Rptr.2d 376], italics added.) This conclusion is consistent with the policy language which obligates the insurer to pay "*all sums* that the insured becomes legally obligated to pay as damages because of personal injury . . . ." (Italics added.) (See also *Martin Marietta Corp. v. Insurance Co. of No. America* (1995) 40 Cal.App.4th 1113, 1125 [47 Cal.Rptr.2d 670].)

Unlike coverage for bodily injury and property damage, which is "occurrence" based, there is no requirement for personal injury coverage that there be an "accidental" occurrence. All that is required is that the injury arise out of the conduct of the insured's business. Thus, even an *intentional* tort, such as those alleged in the Continental complaint, may be covered. The triggering event is the insured's *wrongful act*, not the resulting injury to the third party claimant. Indeed, coverage will exist for a personal injury "offense," *committed during the term of the policy,* even if the injury occurs *after* the

policy expires. (*American Cyanamid Co. v. American Home Assurance Co.* (1994) 30 Cal.App.4th 969, 982 [35 Cal.Rptr.2d 920].)

3. *There Was a Potential for Coverage Under the Atlantic Mutual Policy*

a. *A Liability Insurer's Duty to Defend*

In *Montrose, supra,* 6 Cal.4th 287, the Supreme Court summarized the well-settled rules applicable to a liability insurer's duty to defend. ■ "In *Horace Mann Ins. Co.* v. *Barbara B.* (1993) 4 Cal.4th 1076 [17 Cal.Rptr.2d 210, 846 P.2d 792] (*Horace Mann*), we observed: '[A] liability insurer owes a broad duty to defend its insured against claims that create a potential for indemnity. (*Gray* v. *Zurich Insurance Co.* [1966] 65 Cal.2d 263 [54 Cal.Rptr. 104, 419 P.2d 168] [*Gray*].) As we said in *Gray*, "the carrier must defend a suit which *potentially* seeks damages within the coverage of the policy." (*Id.* at p. 275, italics in original.) Implicit in this rule is the principle that the duty to defend is broader than the duty to indemnify; an insurer may owe a duty to defend its insured in an action in which no damages ultimately are awarded. [Citations.]' (*Horace Mann, supra,* 4 Cal.4th at p. 1081.) [¶] 'The determination whether the insurer owes a duty to defend usually is made in the first instance by comparing the allegations of the complaint with the terms of the policy. Facts extrinsic to the complaint also give rise to a duty to defend when they reveal a possibility that the claim may be covered by the policy. (*Gray, supra,* 65 Cal.2d at p. 276.)' (*Horace Mann, supra,* 4 Cal.4th at p. 1081.) As one Court of Appeal has put it, '[f]or an insurer, the existence of a duty to defend turns not upon the ultimate adjudication of coverage under its policy of insurance, but upon those facts known by the insurer at the inception of a third party lawsuit. [Citation.] Hence, the duty "may exist even where coverage is in doubt and ultimately does not develop." [Citation.]' (*Saylin* v. *California Ins. Guarantee Assn.* (1986) 179 Cal.App.3d 256, 263 [224 Cal.Rptr. 493].) [¶] The defense duty is a continuing one, arising on tender of defense and lasting until the underlying lawsuit is concluded (*Lambert* v. *Commonwealth Land Title Ins. Co.* (1991) 53 Cal.3d 1072, 1077, 1079 [282 Cal.Rptr. 445, 811 P.2d 737]), or until it has been shown that there is *no* potential for coverage. . . .' " (*Montrose, supra,* 6 Cal.4th at p. 295.)

■ "[A]n insurer has a duty to defend an insured if it becomes aware of, or if the third party lawsuit pleads, facts giving rise to the potential for coverage under the insuring agreement. [Citations.] This duty, which applies

even to claims that are 'groundless, false, or fraudulent,' is separate from and broader than the insurer's duty to indemnify. [Citation.]" *(Waller v. Truck Ins. Exchange, Inc.* (1995) 11 Cal.4th 1, 19 [44 Cal.Rptr.2d 370, 900 P.2d 619].) The scope of the duty does not depend on the labels given to the causes of action in the third party complaint; instead it rests on whether the *alleged facts or known extrinsic facts* reveal a *possibility* that the claim may be covered by the policy. (See *Hurley Construction Co. v. State Farm Fire & Casualty Co.* (1992) 10 Cal.App.4th 533, 538 [12 Cal.Rptr.2d 629].)

 Once that possibility of coverage has been raised (in this case, as we discuss below, by the allegations of Continental's complaint) then the insurer may defeat such claim of coverage by extrinsic evidence, but only where " 'such evidence presents *undisputed* facts which *conclusively* eliminate a potential for liability.' " *(Montrose, supra,* 6 Cal.4th at pp. 298-299, italics added.) "Any doubt as to whether the facts establish [or defeat] the existence of the defense duty must be resolved in the insured's favor." *(Id.* at pp. 299-300.) The *Montrose* court endorsed the following statement of the rule that applies in this case: " '[O]nce the insured has established potential liability by reference to the factual allegations of the complaint, the terms of the policy, and any extrinsic evidence upon which the insured intends to rely, the insurer must assume its duty to defend *unless and until it can conclusively refute that potential.* Necessarily, an insurer will be required to defend a suit where the evidence suggests, but does not conclusively establish, that the loss is not covered. . . . A carrier remains free to seek declaratory relief if *undisputed* facts *conclusively* show, *as a matter of law,* that there is no potential for liability.' " *(Id.* at p. 299, quoting the opinion of the Court of Appeal, italics added.)

b. *The Allegations of Continental's Complaint Charged an "Offense" Within the Meaning of the Personal Injury Clause in the Atlantic Mutual Policy*

As the above principles establish, Atlantic Mutual's coverage responsibility is first evaluated by an examination of the complaint in Continental's underlying action against Lamb. We have previously quoted the relevant portions of that complaint (see fn. 3, *ante).* Those allegations are best summarized as follows: Lamb was charged by Continental with *intentionally* communicating with Continental's customers and *falsely* stating to them that Continental was unlawfully selling them products that were subject to Lamb's prior patent claim and that Lamb intended to sue those customers who continued to purchase product from Continental. In short, Continental alleged that Lamb had falsely stated to Continental's customers

that Continental's products were burdened with a prior legal right and their purchase of such products would subject them to litigation.

Such allegations, in our view, clearly allege a disparagement of both Continental as well as its products. The term "disparagement" has been held to include statements about a competitor's goods that are untrue or misleading and are made to influence potential purchasers not to buy. (See *Sentex Systems, Inc. v. Hartford Acc. & Indem. Co.* (C.D.Cal. 1995) 882 F.Supp. 930, 944.) Whether characterized as a trade libel or product disparagement, an injurious falsehood directed at the organization or products, goods, or services of another falls within the coverage of the Atlantic Mutual policy. The plain language of the Atlantic Mutual policy includes in the definition of "personal injury" the publication of any oral or written statement that not only slanders or libels but also one that disparages an organization or its goods, products, or services. This amounts to coverage for product disparagement and trade libel as well as defamation. (See e.g., *Amerisure Ins. Co. v. Laserage Technology Corp.* (W.D.N.Y. 1998) 2 F.Supp.2d 296, 304 [where the court construed nearly identical policy language and reached the same conclusion].)[13]

██ The term "trade libel" was defined in *Nichols v. Great American Ins. Companies* (1985) 169 Cal.App.3d 766 [215 Cal.Rptr. 416], where the court discussed trade libel in depth.[14] As the *Nichols* court explained it: " 'Trade libel is defined as an intentional disparagement of the quality of property, which results in pecuniary damage to plaintiff. . . . *"Injurious falsehood, or disparagement, then, may consist of the publication of matter derogatory to the plaintiff's title to his property, or its quality, or to his business in general,* . . . . [T]he plaintiff must prove in all cases that the publication has played a material and substantial part inducing others not to deal with him, and that as a result he has suffered special damages . . . . Usually, . . . the damages claimed have consisted of loss of prospective contracts with the plaintiff's customers." ' [Citation.]" (*Id.* at p. 773, quoting *Erlich v. Etner* (1964) 224 Cal.App.2d 69, 73 [36 Cal.Rptr. 256], italics added.)██ Here, Continental's complaint alleges that Lamb contacted Continental's customers and falsely accused Continental's products of infringing on Lamb's patent. This clearly constituted a "publication of matter derogatory to the plaintiff's title to his property, or its quality, or to his business in general."

---

[13]Because we read the Atlantic Mutual policy as providing coverage for *both* defamatory and disparaging publications and we find that the alleged statements by Lamb constituted disparagement, we need not consider or discuss their possible defamatory character.

[14]As we note below, the *Nichols* court concluded that no trade libel was involved in the case before it. However, its definition of the term "trade libel" is instructive.

The difference between this case and our earlier decision in *Bennett, supra,* 53 Cal.App.4th 75, upon which Atlantic Mutual heavily relies, is that here the policy language expressly goes beyond coverage for purely defamatory statements to also include the disparagement of a party's business or products. In *Bennett,* the policy language defining the relevant personal injury offense was more restrictive: " 'a publication or utterance . . . of a libel or slander or *other defamatory or disparaging material . . . .*' " *(Bennett, supra,* 53 Cal.App.4th at p. 83, some italics omitted.) ▉ ■ ■ Applying the principles of *ejusdem generis,*[15] we held that the word "disparaging," *as used in that particular policy,* was limited to the defamation of a person's reputation and could not be extended to provide coverage for a claim of disparagement or slander of title to property. *(Bennett,* at p. 86.) Given the much broader language in the policy before us, *Bennett* is of no assistance to Atlantic Mutual's argument.

We simply cannot rely on *Bennett* and adopt Atlantic Mutual's argument that the personal injury coverage under the broader language of its policy did not extend to the claim asserted by Continental. To do so would ignore the very fundamental principle that policy language be so construed as to give effect to every term. (See, e.g., *Fireman's Fund Ins. Co. v. Superior Court* (1997) 65 Cal.App.4th 1205, 1217-1218 [78 Cal.Rptr.2d 418] [a court " 'must strive to give every term meaning unless to do so would render the term inconsistent or contradictory' "]; *Martin Marietta Corp. v. Ins. Co. of North America, supra,* 40 Cal.App.4th at p. 1127 [quoting *Union Oil Co. v. International Ins. Co.* (1995) 37 Cal.App.4th 930, 935 [44 Cal.Rptr.2d 4], and noting that " 'an interpretation that gives effect to every clause is preferred over one that would render other policy terms meaningless' "]; *AIU Ins. Co. v. Superior Court* (1990) 51 Cal.3d 807, 826-827 [274 Cal.Rptr. 820, 799 P.2d 1253] [construing the phrase "damages the insured is legally obligated to pay" and declining to adopt interpretation of the term "damage" that would render the phrase "legally obligated to pay" moot].)

As Granite State emphasizes in its brief, construing the Atlantic Mutual policy in the same manner as the policy language in *Bennett* ("a libel or slander or other defamatory or disparaging material") would render the additional and more expansive phrase in the Atlantic Mutual policy ("or disparages a person or organization's goods, products or services") meaningless. A separate meaning of this phrase must be recognized. To the extent that there is any ambiguity in the language utilized in the insuring clause of

---

[15]The principle of *ejusdem generis* provides that where general words follow the enumeration of particular classes of persons or things, the general words will be construed as applicable only to persons or things of the same general nature or class as those enumerated. *(People v. Dyer* (2002) 95 Cal.App.4th 448, 455 [115 Cal.Rptr.2d 527].)

Atlantic Mutual's policy (see fn. 4, *ante*), that ambiguity may be resolved by construing such language in a way that is consistent with the objectively reasonable expectations of Lamb. (See *Nissel v. Certain Underwriters at Lloyd's of London* (1998) 62 Cal.App.4th 1103, 1110-1112 [73 Cal.Rptr.2d 174].) In our view, coverage for the trade libel clearly alleged here would most certainly fulfill those objectively reasonable expectations. Given the disjunctive language used in the Atlantic Mutual policy, a reasonable insured would objectively expect coverage for the claim asserted by Continental.

Atlantic Mutual disagrees. It relies upon three other cases in addition to *Bennett, supra,* 53 Cal.App.4th 75: *Aetna Cas. & Sur. Co. v. Centennial Ins. Co.* (9th Cir. 1988) 838 F.2d 346, *Nichols v. Great American Ins. Companies, supra,* 169 Cal.App.3d 766, and *Microtec Research v. Nationwide Mut. Ins. Co.* (9th Cir. 1994) 40 F.3d 968. None of these decisions, however, involved actual claims of trade libel such as we have been presented with here, where the insured allegedly communicated directly with the claimant's customers and disparaged both the claimant and its products. Thus, *Aetna, Nichols,* and *Microtec* provide no support for Atlantic Mutual's argument. In each case, the court held that the complaint's allegations did not amount to trade libel, or did not trigger personal injury coverage, because the complaint failed to allege an essential element of trade libel—*a disparaging statement about the plaintiff's product.*[16] Here, Continental's complaint alleges that Lamb contacted Continental's customers and falsely accused Continental of violating Lamb's patent. Such a claim amounted to a denigration of Continental's products no less than if Lamb had claimed they were defectively designed or manufactured. Lamb clearly stated that Continental's products were burdened with a legal infirmity that would place a Continental customer in legal jeopardy if it purchased and used or resold the product. Thus, whereas *Aetna, Nichols,* and *Microtec* did not involve a disparaging statement made about a plaintiff's products, the present case clearly does.

We therefore conclude that, as a matter of law, the insuring clause of Atlantic Mutual's policy provided coverage for the claim asserted by the allegations of Continental's complaint. Thus, a potential for coverage existed. Whether that *potential* coverage was defeated by facts *extrinsic* to Continental's complaint, however, depends upon the applicability of the

---

[16]In *Aetna* and *Microtec,* the insured did not disparage the plaintiff's product, but rather palmed its own product off as that of the plaintiff. In *Nichols,* the insured made no statement disparaging the plaintiff's equipment or license, and the only statements made about the plaintiff at all were made in the course of advertising, and thus fell within a policy exception to coverage for publications or utterances made in the course of advertising.

"first publication" exclusion also relied upon by Atlantic Mutual, but not reached or considered by the trial court. We now turn to that issue.

### c. *Atlantic Mutual Owed Lamb a Duty to Defend the Underlying Continental Action*

 Atlantic Mutual's duty to provide Lamb with a defense depends upon the existence of a *potential* for coverage at the time of tender. Atlantic Mutual claims that such potential was foreclosed by the "first publication" exclusion and evidence that it claimed to have demonstrating that the first publication by Lamb of the disparaging material was *prior* to the inception of the Atlantic Mutual policy; that is, during the Granite State policy period.

Atlantic Mutual's argument overlooks the significance of the fact that it is relying on a policy exclusion. The allegations of the Continental complaint did not specify the date of Lamb's first utterance of any disparagement. Thus, based upon those allegations alone, the *possibility* of coverage existed. That complaint was tendered to Atlantic Mutual. This was sufficient, at that moment, to create a *potential* for coverage and Atlantic Mutual's duty to defend arose.

It is settled that this duty is excused only where " 'the third party complaint can *by no conceivable theory* raise a single issue which could bring it within the policy coverage.' [Citation.]" (*Montrose, supra*, 6 Cal.4th at p. 300, quoting *Gray, supra*, 65 Cal.2d at p. 276, fn. 15, italics added by *Montrose*, some italics omitted.) As we have already noted, "the insured need only show that the underlying claim *may* fall within policy coverage; the insurer *must prove it cannot.*" (*Montrose,* at p. 300, some italics added.)

Atlantic Mutual's response is that it produced a declaration executed by its claims adjuster, who stated that he had spoken with a representative of Lamb and that person had told him "that the dispute between Continental and [Lamb] originated with a conversation which occurred in September of 1998." Apart from the fact that such declaration is both vague and ambiguous and does not clearly *establish* the date of the critical "first publication," it also overlooks the fundamental principles discussed above that an insurer may only defeat an existing potential for coverage by *undisputed* facts that *conclusively* negate such coverage. This is particularly true where the insurer seeks to defeat coverage by reliance on an exclusion. An insurer may rely on an exclusion to deny coverage only if it provides *conclusive evidence*

demonstrating that the exclusion applies. (See, e.g., *Waller v. Truck Ins. Exchange, Inc., supra,* 11 Cal.4th at p. 16 [exclusions are narrowly construed and insurer bears burden of proving their application]; *Merced Mutual Ins. Co. v. Mendez* (1989) 213 Cal.App.3d 41, 47 [261 Cal.Rptr. 273] [same]; *Royal Globe Ins. Co. v. Whitaker* (1986) 181 Cal.App.3d 532, 537 [226 Cal.Rptr. 435] [same]; *Clemmer v. Hartford Insurance Co.* (1978) 22 Cal.3d 865, 880 [151 Cal.Rptr. 285, 587 P.2d 1098] [same].) Thus, an insurer that wishes to rely on an exclusion has the burden of proving, through conclusive evidence, that the exclusion applies in all possible worlds.

The equivocal and self-serving declaration of Atlantic Mutual's own claims adjuster certainly did not rise to the level of *conclusive* evidence. In any event, Lamb disputed Atlantic Mutual's claim as to the date of first publication. While such contrary evidence was not produced by Lamb at the time that Atlantic Mutual denied coverage and refused a defense, that fact does not alter our conclusion that the Continental complaint was, in and of itself, sufficient to establish a potential for coverage that could *only* be defeated by Atlantic Mutual *conclusively* establishing that the "first publication" exclusion applied. Atlantic Mutual did not do that, and it does not matter that Lamb did not produce its contrary evidence until later. Once the potential for coverage had been established by the Continental complaint, Lamb needed to do no more. The burden was on Atlantic Mutual.

In its attempt to demonstrate that it had met that burden, Atlantic Mutual cites *Gunderson v. Fire Ins. Exchange* (1995) 37 Cal.App.4th 1106, 1114 [44 Cal.Rptr.2d 272], and *Ringler Associates Inc. v. Maryland Casualty Co.* (2000) 80 Cal.App.4th 1165, 1184 [96 Cal.Rptr.2d 136], for the proposition that its duty to defend should be based solely on the evidence available to it at the time it denied Lamb's claim. This argument misapplies the holdings in these cases. *Gunderson* was a *bad faith* case where the insured sued his insurer for unreasonably denying coverage. (*Gunderson, supra,* 37 Cal.App.4th at p. 1108.) At the time it denied coverage, the insurer did not have access to any evidence suggesting that the claims in the underlying complaint triggered coverage. (*Id.* at pp. 1110-1111.) Shortly after the insured settled the underlying litigation, he provided his insurer with evidence suggesting that it had a duty to defend. The court held that because he had not provided his insurer with this evidence until after the underlying case had settled, he could not argue that the insurer's denial of coverage was unreasonable and amounted to bad faith. (*Id.* at pp. 1117-1118.)

Similarly, in *Ringler*, an insured/brokerage house brought a *bad faith* action against its insurer for failing to provide it with a defense in a suit that several life insurance companies had brought against it based on allegedly

defamatory statements the brokerage house had made about their policies. (*Ringler Associates Inc. v. Maryland Casualty Co., supra,* 80 Cal.App.4th at pp. 1172-1173.) The insurer denied coverage based on its policy's first publication exclusion and, rather than provide the insurer with evidence regarding the allegedly defamatory statements, the insured intentionally withheld information regarding the "number, nature, and timing of [the] defamatory statements" it allegedly had made. (*Id.* at p. 1184.) The court held that the insurer could not be held liable *for bad faith* when the evidence available to it at the time of tender suggested that the exclusion applied. (*Ibid.*)

These cases are of no help to Atlantic Mutual because, in this case, the potential for coverage was established by the allegations of the underlying Continental complaint. Atlantic Mutual needed no additional information from Lamb on that point. Thus, we do not have here a case where an insured has failed to timely provide information to an insurer that would have established the potential for coverage in the first instance. More significantly, we do not now have before us the claim that Atlantic Mutual was acting in bad faith or had relied *unreasonably* on the "first publication" information developed by its claims adjuster. Lamb raised the bad faith issue in its cross-complaint, but it was never reached by the trial court. Upon remand, the trial court may appropriately consider the reasoning and holdings in *Gunderson* and *Ringler* if Lamb pursues its claim for bad faith against Atlantic Mutual.

Even though it may ultimately be determined that Atlantic Mutual has a viable defense to coverage by virtue of the application of the "first publication" exclusion, this can *only* affect its liability for indemnification. Its duty to defend depended on the existence of only a *potential* for coverage. That *potential* was never conclusively negated and obviously cannot be negated short of an actual trial to resolve what is clearly a genuine factual dispute. Thus, we can only conclude that Atlantic Mutual owed Lamb a defense and it failed to provide it.

For the exact same reasons, Granite State had a similar obligation and it decided, albeit tardily, to satisfy that obligation by its payment to Lamb of the full amount of the costs incurred to defend the Continental action. This circumstance leads us to the next issue which is Granite State's claim that it has a right to equitable contribution from Atlantic Mutual.

4. *Granite State Has a Viable Claim for Equitable Contribution as to Defense Costs*

 In the context of insurance law, the doctrine of equitable contribution may be simply stated. "[W]here two or more insurers independently

provide primary insurance *on the same risk for which they are both liable for any loss to the same insured*, the insurance carrier who pays the loss or defends a lawsuit against the insured is entitled to equitable contribution from the other insurer or insurers, . . ." (*Fireman's Fund Ins. Co. v. Maryland Casualty Co.* (1998) 65 Cal.App.4th 1279, 1289 [77 Cal.Rptr.2d 296] (*Fireman's Fund*), italics added.)

The right to contribution depends upon the existence of an obligation owed to a common insured. The right arises when one of two or more insurers are "*obligated to indemnify or defend*" the same loss or claim and one of those insurers has paid more than its share of the loss or defended the action without participation from the others. (*Fireman's Fund, supra,* 65 Cal.App.4th at p. 1293.) "Equitable contribution permits reimbursement to the insurer that paid on the loss for the excess it paid over its proportionate share of the obligation, on the theory that the debt it paid was *equally and concurrently owed* by the other insurers and should be shared by them pro rata in proportion to their respective coverage of the risk. The purpose of this rule of equity is to accomplish substantial justice by equalizing the common burden shared by coinsurers, and to prevent one insurer from profiting at the expense of others. [Citations.]" (*Id.* at pp. 1293-1294, some italics added, fn. omitted.)

 Applying these principles here, it is clear that both Atlantic Mutual and Granite State provided liability coverage to the same insured for the same risk, although for differing policy periods. Although, as we explain in more detail below, they both could not be liable to provide *indemnification* to Lamb (because of the differing policy periods), that fact does not alter the conclusion that they *both* had a duty to provide a defense. As already discussed, the Continental complaint did not establish the date of the first publication of the disparaging publications and there is still extant an unresolved dispute over that question. It is undisputed, however, that such first publication necessarily occurred during either Granite State's or Atlantic Mutual's policy period. The resolution of that dispute is very significant to the issue of indemnification liability, but it is irrelevant to the defense burden. That burden is *established* by the *existence* of the dispute. (*Horace Mann, supra,* 4 Cal.4th 1076, 1085.)

As we have already explained, Atlantic Mutual had a duty to defend Lamb. Because it was also *possible* that Lamb's offense took place during Granite State's policy period, Granite State also had a duty to defend Lamb. Granite State does not contend otherwise; indeed, it concedes the point by its claim for equitable contribution. It could not do otherwise. Given the uncertainty as to the date(s) of Lamb's actions giving rise to Continental's

claim, a *possibility* of coverage under the policies of both insurers exists and will continue to exist until the issue is *conclusively* determined by a final judicial decision.[17]

Therefore, each insurer had a duty to provide a defense. Granite State has effectively done so and it is therefore entitled to recover from Atlantic Mutual an equitable contribution towards the total defense expenditure. The proper amount that Granite State is entitled to recover will have to be determined in the first instance by the trial court upon remand in accordance with the settled principles applicable to the doctrine of equitable contribution. (See, e.g., Croskey et al., Cal. Practice Guide: Insurance Litigation (The Rutter Group 2001) ¶¶ 8:73.20 to 8:73.32, pp. 8-25 to 8-28.)

We reject Lamb's argument that the terms of the Settlement Agreement preclude Granite State from pursuing its equitable contribution claim against Atlantic Mutual. Although its contentions have not been consistent throughout these proceedings, it appears that Lamb now argues that the Settlement Agreement resolved only its bad faith claim against Granite State and had nothing to do with either defense of the Continental action or indemnification of Continental's claim. There is nothing in this record, however, that provides any support for such a proposition. It is certainly not supported by the terms of the Settlement Agreement, which does not even reflect that a claim for bad faith was pending or existed. Moreover, Lamb has not demonstrated the existence of any facts extraneous to the terms of the Settlement Agreement that would support its present claim that the $120,000 paid to Lamb should be allocated wholly, or in part, to a claim of bad faith. Finally, Lamb's argument appears to be contradicted by the deposition testimony of its "person most knowledgeable," who testified that the Settlement Agreement constituted a novation of the Granite State policy contract and did *not* involve a payment "for defense and indemnity of bad faith."

In short, we agree with the proposition, endorsed by both insurers, that Lamb is simply trying to collect twice for the same claim. If it was Lamb's intent to allocate the $120,000 paid by Granite State, or any portion thereof, to a claim of tortious bad faith on the part of Granite State, then Lamb should have caused such allocation to be explicitly set forth in the Settlement Agreement. As it is presently worded, that Agreement supports, rather than precludes, Granite State's pursuit of equitable contribution against Atlantic Mutual. Thus, the trial court properly resolved this issue by the summary

---

[17]The factual dispute critical to the "first publication" issue (i.e., the date or dates of Lamb's alleged wrongful conduct), on which Atlantic Mutual's *actual* coverage liability depends, was not resolved in the now-settled, underlying Continental action; it will therefore have to be decided in this action.

adjudication, in favor of Granite State, of the claims raised by Lamb's cross-complaint.

The most that Lamb is entitled to recover is the balance of the unreimbursed indemnification expense that it incurred. Such recovery, as we explain below, will depend on a determination by the trial court that (1) there is *actual* coverage under the Atlantic Mutual policy and (2) Lamb has proven the actual value of its settlement with Continental and that such value exceeds the amount paid to Lamb by Granite State over and above the defense costs of $89,455 (i.e., the excess of the *difference* between $120,000 and $89,455).

### 5. *Granite State Also May Have a Viable Claim for Equitable Subrogation*

In a primer on equitable subrogation (and its distinction from equitable contribution), the court in *Fireman's Fund, supra,* 65 Cal.App.4th 1279, summarized the relevant principles.

"The different equitable principles on which contribution and subrogation are based are reflective of different underlying public policies. The aim of equitable subrogation is to place the burden for a loss on the party ultimately liable or responsible for it and by whom it should have been discharged, and to relieve entirely the insurer or surety who indemnified the loss and who in equity was *not primarily liable therefor.* [Citation.] On the other hand, the aim of equitable contribution is to apportion a loss between two or more insurers who cover the same risk, so that each pays its fair share and one does not profit at the expense of the others. [Citations.]" (*Fireman's Fund, supra,* 65 Cal.App.4th at p. 1296, some italics added.)

In *State Farm & Casualty Co. v. Cooperative of American Physicians, Inc.* (1984) 163 Cal.App.3d 199 [209 Cal.Rptr. 251], the court held that in cases "involving disputes between carriers insuring the same policyholder, but for different interests," an insurer that "fulfilled its legal obligation to defend and settle" a third party claim on behalf of its insured assumes the position of its insured by paying the claim, and may sue the other insurers in a separate action "to adjudicate the factual merits of the coverage issue" between them. (*Id.* at pp. 204-205.)

"Properly read, *American Physicians* stands for the principle that where different insurance carriers cover *different* risks and liabilities with respect to the same insured, they may proceed against each other for reimbursement by subrogation rather than by contribution. . . . [C]ontribution is only available in cases where there are coinsurers who share the same level of

obligation on the *same* risk. One insurer has no right of contribution from another insurer with respect to its payment on an obligation for which it was *primarily* responsible, and as to which the liability of the second insurer was only *secondary*. [Citations.]" (*Fireman's Fund, supra,* 65 Cal.App.4th at p. 1298, italics in original.)

Based upon these principles, Granite State seeks to recover from Atlantic Mutual the amount it paid to Lamb under the Settlement Agreement. As we have already discussed, both insurers owed Lamb a defense and they will have to *share* that liability on some equitable basis, such basis to be determined upon remand by the trial court.

The same cannot be said for the amount paid by Lamb to settle the Continental action. That is a burden that falls under the indemnification promise of the policies issued by the insurers. Necessarily, in this case only one insurer can be liable for that. To that extent, Atlantic Mutual and Granite State insured different interests, that is, different time periods, and the operative event could only take place during *one* of those periods. The insurer that has indemnification coverage is the insurer that issued the policy covering the period when Lamb's alleged disparaging publication *first* occurred. If that was during Atlantic Mutual's policy period, then *no act* creating any liability of Lamb would have taken place during the Granite State policy period, and thus Granite State would have no indemnification liability.[18] On the other hand, if Lamb's first disparaging publication occurred during the Granite State policy, then Atlantic Mutual's first publication exclusion would apply, and Atlantic Mutual would have no coverage liability. As indicated above, Atlantic Mutual has the burden of proving the application of its exclusion.

As this comes to us upon a summary judgment granted without considering this critical and disputed issue, we are unable to determine which insurer will have indemnification liability under its policy. That issue will have to be resolved by the trial court upon remand.

If the court determines that Granite State has such liability, then Granite State will not be entitled to recover on its equitable subrogation claim. If, on the other hand, it is determined that Atlantic Mutual is liable to indemnify Lamb, then (in addition to its right to equitable contribution) Granite State shall be entitled to recover on its equitable subrogation claim the difference between the $120,000 it paid to Lamb and the $89,455 (for Lamb's defense

---

[18]As we have already noted (see fn. 4, *ante*), under the insuring clause of the Granite State policy, coverage for personal injury offenses required that they be committed *during* the policy period.

costs) that is the subject of the equitable contribution award already discussed. In addition, and depending on its proof as to the actual value paid to Continental, Lamb would be entitled to recover from Atlantic Mutual the *balance* of the amount (i.e., in excess of the $120,000 paid by Granite State) it actually paid to settle with Continental. Proof of such amount shall be Lamb's burden.

CONCLUSION

Our review of the appellate record demonstrates that the allegations of the Continental complaint charged offenses within the personal injury coverage of the Atlantic Mutual policy; also there are clearly disputed issues of fact as to the application of the "first publication" exclusion. Therefore, there was a *potential* for coverage under the Atlantic Mutual policy. This means that both Atlantic Mutual and Granite State owed a duty to defend Lamb in the underlying Continental action. As Lamb has already recovered its defense costs from Granite State, however, Atlantic Mutual's liability for such defense costs will be limited to what is owed to Granite State under the latter's equitable contribution claim. Lamb's claim that Granite State cannot assert such a claim is without merit.

The issue of Atlantic Mutual's liability for indemnity, however, will depend on the trial court's determination of (1) whether there was any *actual* coverage under the Atlantic Mutual policy and, if so, (2) the amount that Lamb actually paid to settle the Continental action. The resolution of the first issue will turn on the application of the "first publication" exclusion in the Atlantic Mutual policy. On this question, Atlantic Mutual will have the burden of proof. If such actual coverage under the Atlantic Mutual policy is found to exist, however, then Granite State will be entitled to recover from Atlantic Mutual, under the principles of equitable subrogation, up to the $30,545 sum that Granite State paid to Lamb for indemnity under its policy.

The second issue will be determined upon evidence as to the *actual value* of the consideration given by Lamb to settle the Continental action. On this issue, Lamb will have the burden of proof. If Lamb establishes that the value of the consideration paid to Continental to settle the underlying action exceeded the $30,545 received from Granite State (i.e., the difference between the $120,000 paid by Granite State and the amount allocated to the defense costs expended by Lamb), then Lamb will be entitled to recover such amount from Atlantic Mutual if there is actual coverage under its policy.

We therefore will reverse the judgment of the trial court and remand with directions for the conduct of such further proceedings as will address and

resolve these issues, as well as any others that may arise therefrom or that remain unaddressed as the result of the trial court's grant of a summary judgment to Atlantic Mutual.

## DISPOSITION

The judgment is reversed and both matters (case Nos. B150674 and B151708) are remanded to the trial court for further proceedings not inconsistent with the views expressed herein. Each party shall bear its own costs on appeal.

Klein, P. J., and Aldrich, J., concurred.