Filed 2/28/23  Heidari v. Golden Bear Ins. Co. CA1/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| ALI HEIDARI,<br><br>        Plaintiff and Appellant,<br><br>v.<br><br>GOLDEN BEAR INSURANCE COMPANY,<br><br>        Defendant and Respondent. | A165815[1]<br><br>(Santa Clara County<br>Super. Ct. No. 17CV306136) |

In 2014, appellant Ali Heidari filed suit against Saratoga Construction (Saratoga), alleging construction defects in Saratoga's construction of his home in Monte Sereno.  Saratoga tendered defense of the action to respondent Golden Bear Insurance Company (GBIC), which insured Saratoga under a general commercial liability policy during part of the period during which the home was constructed.  GBIC denied coverage.  Heidari and Saratoga settled the underlying action, Saratoga assigned its rights under the policy to Heidari, and he brought suit against GBIC seeking declaratory relief regarding its duty to defend the underlying action.  A bifurcated trial was held on the issue of GBIC's duty to defend, at the conclusion of which the

_____

[1] On August 9, 2022, the Chief Justice ordered that this case be transferred from the Sixth Appellate District, where it had case number H047317, to the First Appellate District, where it was assigned case number A165815.

1

trial court found that because subcontractors performed all the construction work on the property, coverage was barred under the contractors' warranty exclusion contained in the policy. We affirm.

## BACKGROUND

### The Factual Setting

On November 14, 2014, Heidari filed suit against Saratoga in Santa Clara Superior Court (*Ali Heidari v. Wells Fargo Bank, N.A.*, et al, Case No. 114CV273242) (the underlying action) alleging construction defects in connection with the construction, between May of 2006 and June of 2008, by Saratoga of a residential property on Oak Drive in Monte Sereno, purchased by Heidari at a foreclosure sale in 2009 or early 2010.

The complaint in the underlying action alleged that "the residence's exterior decks and stairs allow water to enter into the structure," the "residence's exterior walls . . . allow unintended water to pass into the structure," "the residence's hardscape . . . were installed in such a way as to cause water or soil erosion to enter into or come in contact with the structure," "the shower enclosure in the master bedroom shower leaks into the flooring system," "there are cracks in the ceiling in the family room," "there is flooding in front of the garage when it rains," "the residence's retaining walls and site walls (and the drainage systems associated with those walls) allow water to pass beyond, around or through its designed (or actual) moisture barrier," "there are gaps in the hardwood floor and the floor squeaks," and "the post supporting the driveway gate at the top of the property has settled causing damage to the post and the gate."

After service of the complaint, Saratoga tendered the defense and indemnity of the underlying action to its insurance carriers, including

2

respondent GBIC, which insured Saratoga under a commercial general liability policy between July 13, 2006 and March 9, 2007.

By letter dated December 30, 2015, GBIC declined the request for defense and indemnity.

Heidari and Saratoga settled the underlying action on October 14, 2016. As part of the settlement agreement, Saratoga assigned to Heidari all claims and causes of action against GBIC for failure or refusal to defend. The matter then proceeded to an uncontested trial, at the conclusion of which the trial court entered a default judgment of $528,761, plus costs, against Saratoga.

**The Proceedings Below**

On February 8, 2017, Heidari filed the instant action against GBIC in Santa Clara Superior Court, seeking declaratory relief regarding GBIC's duty to defend and to indemnify, and alleging breach of contract and breach of the implied covenant of good faith and fair dealing.

Both parties moved unsuccessfully for summary adjudication or summary judgment on the issue of GBIC's duty to defend.

On January 4, 2019, the parties filed a set of Stipulated Facts for Trial, including the following:

"• Saratoga was the general contractor for the demolition and construction of the property between approximately May of 2006 and June 30, 2008. [¶] . . . [¶]

"• Saratoga was responsible for supervising the work of all subcontractors and material suppliers at the property.

"• Saratoga retained subcontractors to construct the retaining wall at the property at issue in the litigation. [¶] . . . [¶]

3

"• Saratoga cannot identify all subcontractors it retained to work on the Subject Property at issue in the litigation.

"• Saratoga cannot locate any copies of any subcontracts for the work at the property.

"• Saratoga cannot locate any copies of insurance certificates identifying Saratoga Construction, Inc. as an additional insured for Saratoga Construction, Inc.'s subcontractors' work at the property.

"• The demolition work began on or around May of 2006.

"• The Notice of Completion for improvement of the property was recorded on November 30, 2007.

"• The Final Inspection of the property took place and passed inspection on June 30, 2008.

"• GBIC issued CGL policy number GBL 07088 to Saratoga effective July 13, 2006, through July 13, 2007 (the 'Policy').

"• The Policy was cancelled due to non-payment of the premium, with an effective cancellation date of March 9, 2007.

"• Saratoga's owner, Reza Norouzi, destroyed all project job file documents when the property entered foreclosure."

A three-day bifurcated bench trial on the issue of GBIC's duty to defend took place in May of 2019, with testimony from Beth Ossino, GBIC's claims manager; Reza Norouzi, Saratoga's owner and principal; and Michael Stevens, Saratoga's attorney.

GBIC argued that coverage was barred by various exclusions in its policy, including—as will be discussed in greater detail—a contractors' warranty exclusion providing that coverage "shall not apply to occurrences arising out of operations performed by Independent Contractors unless, as a condition precedent," Saratoga obtained agreements from its subcontractors

to hold Saratoga harmless for liabilities incurred and certificates of insurance listing Saratoga as an additional insured.  GBIC also argued that coverage was barred under the policy because Saratoga's work on the property was not completed during the policy term.

At trial, Ossino testified regarding Saratoga's application for insurance from GBIC, on which it had indicated that "90%" of the work was to be performed by subcontractors, and in describing the work that was subcontracted, wrote that "ALL TRADES ARE SUBBED OUT":

"Q.  What was your understanding in reading the terminology 'All trades are subbed out?'

"A.  That all the actual work performed out there was done by subcontractors, that Saratoga probably provided just supervision, probably scheduling timing permanent type work, but all the actual trades—the actual construction work was performed by subcontractors.

"Q.  Right in the middle of that box next to that section, there is a—it looks like percent symbol, work subcontract, it says: '90%.'  Do you see that?

"A. Yes.

"Q.  What is your understanding of that when you had this statement: 'All trades subbed out.'  How did this correlate?

"A.  The ten percent would have been the insured supervision work, and 90 percent would be all the actual construction work on the projects. [¶] . . . [¶]

"Q.  Did you have any understanding at all whether Saratoga Construction had worksite employees?

"A.  Based on what they told the inspector, I think at that time, they said that they only had one other full-time employee who was a job superintendent, and I think on the application, it also notes an accounting

5

person.  So we didn't have any indication that they had anybody actually out there performing work, other than supervisory work."

Norouzi testified to the contrary, that Saratoga's own employees did perform construction work on the project, including the "site drainage installation," and "the waterproofing and the drainage work behind the retaining wall."

Norouzi also testified regarding Saratoga's insurance application:

"Q.  You see, maybe you want to use the magnifying glass right there, where it says: 'Percentage work subcontracted.'

"A.  Yes.

"Q.  So Saratoga Construction didn't—did not subcontract out all the work on his projects, only the trades?

"A.  For sure, yes.

"Q.  And the trades aren't all of the work on the project, are they?

"A.  No.  [¶] . . . [¶]

"Q.  Who are the trades?

"A.  Subcontractors.

"Q.  You were naming them?

"A.  Roofing, foundation, framing, electrical, plumbing, sheet rock, stucco, yeah.

"Q.  Those things were subbed out, correct?

"A.  Yes.

"Q.  And Saratoga Construction still had some men working, right?

"A.  I had some workers, yes.

"Q.  And they did work that were not the trades?

"A.  Yes.

6

"Q. Is this an accurate statement here that 90 percent of the work for the trades work, which is 90 percent of the total work was subbed out?

"A. Yes. [¶] . . . [¶]

"Q. Mr. Norouzi, I believe you previously testified that you—Saratoga self-performed some site drainage work?

"A. Yeah. [¶] . . . [¶] The drainage behind the retaining wall. Yes."

At the conclusion of the trial, the trial court rendered an oral statement of decision, finding as follows:

"THE COURT: Thank you. All right. [¶] So in this matter, I thought a lot about all of the evidence that was presented during the trial, and I considered the credibility of the witnesses. And in considering credibility, the Court considered the demeanor of the witnesses while they were testifying, the consistency of the testimony while testifying, and compared to other admissible evidence, including their depositions. It's coherently [*sic*], and whether or not the testimony was corroborated. And based on those factors, the Court found Mrs. Ossino to be credible.

"Mr. Norouzi was not credible. His demeanor consistently changed when he was caught in a lie. He was very nervous. He was almost shaking, and sometimes he seemed to be on the verge of tears. When he was telling the truth, his demeanor would change. He became more casual, relaxed. For instance, when he said that the property wasn't completed until late 2007 or 2008, was very relaxed, was very assured. When he said nobody lived at the property during construction, he was very matter of fact, not nervous, not anxious. Not like when he was discussing his file, and whether or not he gave it to his attorney or when he destroyed it.

"But in the end, the evidence was clear that Mr. Norouzi destroyed his job file way before the underlying litigation began. That his attorney knew

7

that he had destroyed the file, but neither Mr. Stevens nor Mr. Norouzi ever revealed to Golden Bear during the time there was a tender for a defense that that file did not exist, or any of the information that Golden Bear had asked for. Really, what this case came down to, and the Court's perception of the evidence it heard, was that Mr. Stevens and Mr. Norouzi wanted to give the insurance company, Golden Bear, just enough information without trying to lie of some sort of fact that would put them under the policy for a potential claim without revealing the truth of the situation. And when you look at the truth of the situation, there was no coverage, and that's why they didn't want to disclose the full truth, because they knew there was no coverage under the policy, had they disclosed what they knew. But at the time that the defense was tendered, there was enough information in the complaint and in the insurance policy, and the extrinsic evidence that Mrs. Ossino found, namely, the completion date of the project that it was out, after the policy was canceled with that, she had sufficient information to deny the claim.

"More over, after the matter was submitted just a few moments ago, based on the information of reopening, and we talked a lot about the condition proceeding [*sic*] and whether or not Mr. Norouzi complied with that request for information as to the contract and the warranties, he never supplied that information, nor could he ever have. And therefore, there is no potential claim, because he couldn't satisfy the condition proceeding [*sic*].

"And given the testimony that I've heard this afternoon, and the documents, the Court is satisfied that the evidence shows that all of the work was done by subcontractors. And because they hadn't completed the condition precedent, again, there is no coverage. [¶] . . .[¶]

"It's clear that Mr. Norouzi, nor his attorney, Mr. Stevens, ever gave any warranties or insurance documents related to the subcontractors to

8

Golden Bear. Not when Golden Bear specifically asked for the documents, or at any time during the litigation—the underlying litigation. And no such documents were produced here at trial.

"Furthermore, since Mr. Norouzi destroyed his job file, no such documents could have ever been produced to Golden Bear. Per policy terms, such documents were a condition precedent to coverage for the subcontractors work, including a duty to defend Saratoga Construction for any work performed by subcontractors."

On July 22, 2019, the trial court issued a written statement of decision, finding as to the contractor's warranty exclusion as follows:

"In the instant matter, coverage was not afforded by the policy for occurrences arising out of operations performed by independent contractors unless, as a condition precedent, the insured received a written agreement from each and every independent contractor holding the insured harmless for all liabilities incurred by the independent contractor, the insured obtained certificates of insurance from each and every independent contractor indicating that they maintain coverage the same as provided by the policy and with limits in the same amounts as provided by their policy, and the insured was listed as an additional insured under that policy. The insured also had to warrant that the independent contractor's insurance would remain in force until completion of the independent contractor's work for the insured.

"Defendant's evidence at trial demonstrated that its own file, which it reviewed in determining whether to provide a defense for Saratoga in the Underlying Action, revealed that at the time Saratoga applied for insurance the insured represented that its employee would supervise the work done at the Property, and that the work on the Property and to build the structure

9

would be done by independent subcontractors. The complaint did not allege or disclose which entities completed the work on the property, and the letters by Mr. Stevens to Defendant never stated that Saratoga completed any of the work on the property or grounds and only referred to work completed by subcontractors. Mr. Stevens admitted that Ms. Ossino had requested, among other things, subcontractor agreements, subcontractor insurance certificates and insured endorsements affording coverage for Saratoga, but he never provided any such documents to her. Furthermore, Mr. Norouzi destroyed his project file and presumably any written agreements and insurance certificates from each and every independent contractor, if any existed. Mr. Stevens knew this, but did not disclose the information to Ms. Ossino. Accordingly, the court concludes that Mr. Norouzi never complied with the conditions precedent by providing the necessary information for each and every independent subcontractor to Defendant before, contemporaneous with or after the requested tender of defense, and like [*State Farm Mutual Automobile Insurance Company v. Richard Cecil*] *Flynt* [(1971) 17 Cal.App.3d 538], Defendant was never required to tender a defense."

As an independent basis for finding that GBIC had no duty to defend, the trial court also concluded that there was no coverage because the policy expired by July 2007, whereas the project was not completed until December 2007, and thus "the Project was not put to its intended use until after the insurance policy issued by Defendant had terminated."

Judgment was subsequently entered in favor of GBIC, from which Heidari filed a notice of appeal.

10

## DISCUSSION

### Applicable Law and the Standard of Review

A recent case by our colleagues in Division Three distilled the applicable law:

"An insurer ordinarily is free to limit the risks it assumes, and we do not rewrite any provision of any contract, including an insurance contract, for any purpose, including perceived public policy benefits. (*Underwriters of Interest Subscribing to Policy Number A15274001 v. ProBuilders Specialty Ins. Co.* (2015) 241 Cal.App.4th 721, 729 ([*ProBuilders*]); *Certain Underwriters at Lloyd's of London v. Superior Court* (2001) 24 Cal.4th 945, 967–968 (*Certain Underwriters*).) However, any ambiguity is generally resolved in favor of coverage. (*AIU* [*Ins. Co. v. Superior Court* (1990)] 51 Cal.3d [807,] 822.) We interpret the terms of an insurance policy de novo. (*Powerine Oil Co., Inc. v. Superior Court* (2005) 37 Cal.4th 377, 390.)

"A liability insurer has a 'broad duty to defend its insured against claims that create a potential for indemnity.' (*Montrose Chemical Corp. v. Superior Court* (1993) 6 Cal.4th 287, 295 (*Montrose*).) If, on the other hand, there is no potential for coverage, the insurer has no duty to defend. (*La Jolla Beach & Tennis Club, Inc. v. Industrial Indemnity Co.* (1994) 9 Cal.4th 27, 40 (*La Jolla Beach & Tennis Club*).) This standard is met ' "if the third party complaint *can by no conceivable theory raise a single issue which could bring it within the policy coverage.*" ' (*Montrose*, at p. 300.) Thus, the duty to defend is 'not without limits'; rather, it is 'limited by "the nature and kind of risk covered by the policy." ' (*La Jolla Beach & Tennis Club*, at p. 39, italics omitted.)" (*24th & Hoffman Invs., LLC v. Northfield Ins. Co.* (2022) 82 Cal.App.5th 825, 833–834.)

11

"A 'potential for coverage' refers to the possibility that facts alleged in the complaint or otherwise known to the insurer establish a basis for indemnity under the policy. (*Scottsdale Ins. Co. v. MV Transportation* (2005) 36 Cal.4th 643, 654–655.) If there is a dispute as to the existence of such facts, a potential for coverage exists until the factual dispute is resolved so as to establish either actual coverage or the absence of coverage. (*Id.* at pp. 655, 657; *Horace Mann Ins. Co. v. Barbara B.* (1993) 4 Cal.4th 1076, 1085.)" (*State Farm Gen. Ins. Co. v. Mintarsih* (2009) 175 Cal.App.4th 274, 284, fn. 6.)

The interpretation of GBIC's insurance policy and the existence of a duty to defend are questions of law that we review de novo. (*Hartford Casualty Ins. Co. v. Swift Distribution, Inc.* (2014) 59 Cal.4th 277, 286–288; *North American Capacity Ins. Co. v. Claremont Liability Ins. Co.* (2009) 177 Cal.App.4th 272, 284 (*Claremont*).)

"We review the trial court's factual findings for substantial evidence. (*Foreman & Clark Corp. v. Fallon* (1971) 3 Cal.3d 875, 881.) We begin with the presumption that the record contains evidence to uphold every finding of fact and appellant has the burden to demonstrate there is no substantial evidence to support the findings under attack. (*Ibid*.) ' "When a finding of fact is attacked on the ground that there is not any substantial evidence to sustain it, the power of an appellate court *begins* and *ends* with the determination as to whether there is any substantial evidence contradicted or uncontradicted which will support the finding of fact." [Citations.]' (*Ibid*.)" (*Claremont, supra*, 177 Cal.App.4th at p. 285.)

**The Trial Court Properly Found No Duty to Defend Based on the Contractors Warranty Exclusion**

The contractors warranty exclusion in the policy provides as follows:

"**EXCLUSION – CONTRACTORS WARRANTY**

"Such coverage as is afforded by the policy to which this endorsement is attached shall not apply to occurrences arising out of operations performed by Independent Contractors unless, as a condition precedent:

"1. The Insured will receive a written agreement from each and every Independent Contractor holding the Insured harmless for all liabilities incurred by the Independent Contractor.

"2. The Insured will obtain certificates of insurance from each and every Independent Contractor indicating that they maintain coverage the same as provided by this policy and with limits in the same amounts as provided by this policy, and that the Named Insured will be listed as an additional insured under that policy.

"3. The Insured warrants that the aforementioned Independent Contractor's insurance will remain in force until completion of the Independent Contractor's work for the Insured."

Heidari does not dispute that these conditions were not satisfied with respect to any of the subcontractors' work on the project—the only question as to whether the exclusion completely bars coverage under the policy is whether there was any work performed by Saratoga itself.

We agree with the trial court that the allegations of the complaint, together with the extrinsic facts known to GBIC at the time of tender, show there was no potential for coverage because subcontractors performed all of the construction work on the project. To begin with, the complaint in the underlying action did not identify any construction work performed by Saratoga itself as opposed to its various subcontractors. And Exhibit F to that complaint, a September 29, 2016 demand letter from Saratoga's attorney to an attorney for North American Capacity Insurance, another of Saratoga's insurers, further indicated that certain work on the property alleged to be

13

defective—including the grading and excavation, the hardwood flooring, and the retaining wall—was performed by subcontractors:

"Saratoga Construction, Inc., used various subcontractors and independent suppliers for select portions of the construction including, but not limited to, grading and excavation, pouring of concrete and concrete walls, electrical facilities, plumbing facilities and installation of hardwood flooring. Further, the rough grading and excavation, including that required for the driveway and retaining wall at the top of the property, was complete by June 30, 2006 and the foundations for the residence and the retaining wall were thereafter poured by an independent supplier."

On its application for insurance, in response to a prompt asking that it "describe the type of work subcontracted," Saratoga wrote that "ALL TRADES ARE SUBBED OUT," and indicated that "90%" of the work was subcontracted. Ossino testified that GBIC understood these representations to mean that "all the actual work performed out there was done by subcontractors, that Saratoga probably provided just supervision, probably scheduling timing permanent type work, but all the actual trades—the actual construction work was performed by subcontractors." And she further testified that "[b]ased on what they told the inspector," Saratoga's only full-time employees were a job superintendent and an "accounting person," so that Saratoga could not have had any employees performing construction work.

Heidari's opening brief does not identify any specific work that Saratoga self-performed on the project, but instead asserts that GBIC was "on notice that its insured possibly performed at least 10 percent of the work" based on its insurance application, and that a "logical inference" from the demand letter's statement that "select portions" of the construction were

14

performed by subcontractors was that other work was performed by Saratoga itself. But as noted, GBIC understood Saratoga's insurance application to mean that the 10% of the work Saratoga performed itself was supervisory or scheduling work, a conclusion supported by the fact that Saratoga did not have any full-time employees who could have performed construction work. And the fact that Saratoga chose to assert in a demand letter that specific "select portions" of the construction were performed by subcontractors does nothing to establish that Saratoga must have self-performed other aspects of the project.

In arguing that there was a potential for coverage, Heidari also relies on Norouzi's testimony that "the trades" would not include all of the work performed, and that Saratoga itself performed the "site drainage" installation, and the "waterproofing and the drainage work behind the retaining wall." And in his reply brief, Heidari argues that the trial court's factual finding that all the work was performed by subcontractors as well as its finding that Norouzi's testimony was not credible are "irrelevant" because the duty to defend can only be determined at the time of tender and not based on "hindsight," relying on *Atlantic Mutual Ins. Co. v. Lamb, Inc.* (2002) 100 Cal.App.4th 1017 (*Atlantic Mutual*). We are not persuaded.

In *Atlantic Mutual*, Continental brought a federal action against Lamb seeking a declaration that a patent claimed by Lamb was invalid and unenforceable, and Lamb tendered defense of the action to its insurers Granite State and Atlantic Mutual. Atlantic Mutual denied coverage in part based on a "first publication" exclusion in its policy providing that coverage did not apply to publication of material that took place before the policy period. (*Atlantic Mutual*, *supra*, 100 Cal.App.4th at pp. 1024–1026.) Atlantic Mutual then brought an action for declaratory relief against Lamb and

15

Granite State, and moved for summary judgment on the ground that there was no coverage for the underlying claim and that it therefore had no duty to Granite State, under either a theory of equitable subrogation or equitable contribution. (*Id*. at p. 1028.) In moving for summary judgment, Atlantic Mutual argued that the first publication exclusion applied based on a declaration from its claims adjuster, who claimed he had been told " 'that the dispute between Continental and [Lamb] originated with a conversation which occurred in September of 1998.' " (*Id*. at p. 1038.) The trial court granted Atlantic Mutual's motion, without reaching the question of whether the first publication exclusion applied. (*Id*. at pp. 1028, 1037–1038.) The Court of Appeal reversed, then reached the first publication issue and concluded that Atlantic Mutual had failed to carry its burden to prove that the exclusion applied:

"The equivocal and self-serving declaration of Atlantic Mutual's own claims adjuster certainly did not rise to the level of *conclusive* evidence. In any event, Lamb disputed Atlantic Mutual's claim as to the date of first publication. While such contrary evidence was not produced by Lamb at the time that Atlantic Mutual denied coverage and refused a defense, that fact does not alter our conclusion that the Continental complaint was, in and of itself, sufficient to establish a potential for coverage that could *only* be defeated by Atlantic Mutual *conclusively* establishing that the 'first publication' exclusion applied. Atlantic Mutual did not do that, and it does not matter that Lamb did not produce its contrary evidence until later. Once the potential for coverage had been established by the Continental complaint, Lamb needed to do no more. The burden was on Atlantic Mutual." (*Atlantic Mutual, supra*, 100 Cal.App.4th at p. 1039.)

But as *Atlantic Mutual* went on to observe:

16

"Even though it may ultimately be determined that Atlantic Mutual has a viable defense to coverage by virtue of the application of the 'first publication' exclusion, this can *only* affect its liability for indemnification.  Its duty to defend depended on the existence of only a *potential* for coverage.  That *potential* was never conclusively negated and obviously cannot be negated short of an actual trial to resolve what is clearly a genuine factual dispute.  Thus, we can only conclude that Atlantic Mutual owed Lamb a defense and it failed to provide it." (*Atlantic Mutual*, *supra*, 100 Cal.App.4th at p. 1040.)

*Atlantic Mutual* is distinguishable.  Here, as discussed, the complaint was not in and of itself sufficient to establish a potential for coverage.  And here, unlike in *Atlantic Mutual*, there *was* an "actual trial" on the issue of whether GBIC had a duty to defend, after which the trial court made a factual finding that any potential for coverage was negated by the contractor's warranty exclusion because subcontractors, and not Saratoga itself, performed all the construction work on the project.  (See *State Farm Gen. Ins. Co. v. Mintarsih*, *supra*, 175 Cal.App.4th at p. 284, fn. 6 ["If there is a dispute as to the existence of such facts, a potential for coverage exists *until the factual dispute is resolved so as to establish either actual coverage or the absence of coverage*" (emphasis added)]; *Scottsdale Ins. Co. v. MV Transportation*, *supra*, 36 Cal.4th at p. 655 [duty to defend is "extinguished" when "insurer negates all facts suggesting potential coverage"].)

Thus, to the extent that Heidari relies on Norouzi's testimony, or asks us to draw inferences in his favor from Saratoga's insurance application or the demand letter attached to the complaint, his arguments fail because we apply the ordinary rule that we review the trial court's factual findings after

17

trial for substantial evidence. As we recently explained in *Lincoln v. Lopez* (2022) 77 Cal.App.5th 922, in language equally applicable here:

"While [Hediari]'s brief does set forth some of the facts the trial court did decide adversely to him, the brief throughout refers to other evidence, as though this is of some significance. It is not, for several reasons, beginning with the fundamental appellate principle that all evidence must be viewed most favorably to [GBIC] and in support of the decision. (*Nestle v. City of Santa Monica* (1972) 6 Cal.3d 920, 925–926; *Foreman & Clark Corp. v. Fallon*[, *supra*,] 3 Cal.3d [at p.] 881; *In re Marriage of Hoffmeister* (1987) 191 Cal.App.3d 351, 358 ['Where statement of decision sets forth the factual and legal basis for the decision, any conflict in the evidence or reasonable inferences to be drawn from the facts will be resolved in support of the determination of the trial court decision'].) Put otherwise, [Heidari]'s attempt to point to other evidence is misguided, as we must affirm even if there is substantial contrary evidence. (See *Bowers v. Bernards* (1984) 150 Cal.App.3d 870, 874.) As the court put it in *Pope v. Babick* (2014) 229 Cal.App.4th 1238, 1245, 'We do not review the evidence to see if there is substantial evidence to support the losing party's version of events, but only to see if substantial evidence exists to support the verdict in favor of the prevailing party.' " (*Lincoln v. Lopez, supra,* 77 Cal.App.5th at pp. 928–929, fn. omitted.)

And to the extent Heidari relies on Norouzi's testimony, his argument fails for the additional reason that the trial court expressly found that testimony not credible, a finding we do not revisit on appeal, and which means his testimony is not substantial evidence. (See *Conservatorship of O.B.* (2020) 9 Cal.5th 989, 1006 ["Substantial evidence is evidence that is 'of ponderable legal significance,' 'reasonable in nature, *credible,* and of solid

value' " (emphasis added)]; *In re Marriage of Oliverez* (2019) 33 Cal.App.5th 298, 319; *Bruno v. Hopkins* (2022) 79 Cal.App.5th 801, 823–824.)

The two cases on which Heidari primarily relies—*ProBuilders*, *supra*, 241 Cal.App.4th 721 and *Evanston Insurance Co. v. American Safety Indemnity Co.* (N.D. Cal. 2011) 768 F.Supp.2d 1004 (*Evanston*)—do not assist him.

In *ProBuilders*, *supra*, 241 Cal.App.4th 721, Underwriters sought equitable contribution from ProBuilders for the defense of their mutual insured Pacific Trades, and the trial court granted summary judgment to ProBuilders on the basis of an "other insurance" clause. (*Id*. at pp. 726–727.) The Court of Appeal reversed on that issue, and also rejected ProBuilders' alternative argument that summary judgment in its favor should be affirmed on the basis of a contractors warranty endorsement in the policy:

"ProBuilders's policies contained the CSC endorsement that provided, as a 'condition precedent to this policy applying to any claim in whole or in part based upon work performed by independent contractors,' Pacific Trades must have (1) obtained valid written indemnity agreements from the subcontractors it hired to build the homes, and (2) obtained Certificates of Insurance from the subcontractors it hired showing Pacific Trades was an additional insured under the subcontractors' insurance policies, and (3) maintained records evidencing compliance with those obligations. ProBuilders produced some evidence below that only 13 of Pacific Trades's subcontractors had written contracts with Pacific Trades, and Underwriters was unable to collect any defense reimbursements from any subcontractor. Based on this evidentiary showing, ProBuilders asserts it conclusively demonstrated there was no coverage for the claims asserted in the Aceves lawsuit, which was fatal to Underwriters's claim for equitable contribution,

19

and therefore we may affirm the entry of summary judgment in favor of ProBuilders on the alternative ground that it conclusively established it owed no defense obligation under the policies.

"We are not persuaded by ProBuilders's argument, for several reasons. First, the CSC provision on its face applies only to claims against Pacific Trades 'in whole or in part based on work performed by independent contractors,' but does not purport to apply to claims against Pacific Trades for its own negligence or other misfeasance. ProBuilders's showing below did not conclusively establish that *all* of the claims against Pacific Trades in the Aceves lawsuit were *limited* to claims based on work performed by independent contractors; to the contrary, the attorney hired to defend it in the underlying action averred Pacific Trades was included as a defendant based on allegations of Pacific Trades's own negligence. Because ProBuilders's showing was inadequate to definitively eliminate the potential for coverage under the CSC provision for some part of the claims against Pacific Trades, its showing was inadequate to enter summary judgment against Underwriters's claim for equitable contribution. (See *Evanston*[, *supra*,] 768 F.Supp.2d 1004.) Second, even assuming some of the claims against Pacific Trades in the Aceves lawsuit *were* 'based on work performed by independent contractors' within the ambit of the CSC provision, there was some evidence below raising a triable issue of fact as to whether Pacific Trades *had* complied with its terms, because the record below contained at least one written subcontract between Pacific Trades and a subcontractor, and the record also contained numerous Certificates of Insurance showing Pacific Trades *was* an additional insured under many subcontractors' insurance policies. We conclude ProBuilders's argument that summary judgment was proper based on Pacific Trades's alleged noncompliance with

20

the CSC provision is without merit." (*ProBuilders*, *supra*, 241 Cal.App.4th at p. 734.)

*ProBuilders* is distinguishable, first because it was decided on summary judgment, where ProBuilders was required to show that "one or more elements of the [plaintiff's] cause of action cannot be separately established" or "that there is a complete defense to that cause of action." (Code Civ. Proc., § 437c, subds. (o), (p).) "The evidence of the moving party is strictly construed and that of the opponent liberally construed, and any doubts as to the propriety of granting the motion are to be resolved in favor of the party opposing the motion." (*ProBuilders*, *supra*, 241 Cal.App.4th at p. 727.) Here, by contrast, we review a factual finding based on the evidence at trial that all the construction work *was* performed by subcontractors. And in *ProBuilders*, there were "allegations of Pacific Trades's own negligence"— not so here with respect to Saratoga.

*Evanston*, *supra*, 768 F.Supp.2d 1004, is similarly inapposite. In that case, Evanston brought an equitable contribution claim against American Safety for the costs of defense of their mutual insured, developer Northern Cal, in an underlying lawsuit alleging that single-family homes constructed by Northern Cal had several defects. (*Id.* at pp. 1006, 1008.) The court denied American Safety's motion for summary judgment based on a contractor's warranty exclusion in its policy that applied to damage "arising directly or indirectly out of the actions of a subcontractor." (*Id.* at p. 1010.) Because American Safety did "not point to any evidence that any or all of the damages alleged in the *Ayala* action are attributable to Northern Cal's subcontractors," it had "not foreclosed the possibility that . . . some of the *Ayala* plaintiffs' claims could be covered by its policy," and accordingly the

court denied American Safety's motion for summary judgment based on the endorsement. (*Id*. at pp. 1011–1012.)

Again, the situation before us is different because GBIC did produce "evidence that . . . all of the damages alleged in the [underlying] action are attributable to [Saratoga's] subcontractors," evidence which led the trial court to conclude that all of the construction work was performed by subcontractors and thus that the contractors' warranty exclusion eliminated any potential for coverage.[2] (*Evanston, supra*, 768 F.Supp.2d at p. 1011.)

## DISPOSITION

The judgment is affirmed. GBIC shall recover its costs on appeal.

---

[2] Because we affirm the judgment on the basis of the contractors' warranty exclusion, we need not reach the parties' arguments regarding the various other terms and exclusions of GBIC's policy.

_____
Richman, J.

We concur:

_____
Stewart, P. J.


_____
Van Aken, J. *


*Heidari v. Golden Bear Insurance Company* (A165815)

     *Judge of the San Francisco Superior Court, Judge Christine Van Aken, sitting as assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.